Filed 6/9/16  P. v. Ruch CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H042445 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS150145A) |
| v. | |
| ROBERT ALLEN RUCH, | |
| Defendant and Appellant. | |

Defendant Robert Allen Ruch was convicted after a jury trial with one count of corporal injury on a spouse (Pen. Code, § 273.5, subd. (a)).[1]  He was sentenced to a term of three years in prison.  On appeal, he argues that the trial court abused its discretion when it allowed the People to present expert testimony on intimate partner battering.  He claims that the proffered testimony was more prejudicial than probative and improperly bolstered the victim's credibility.  Lastly, he insists that his trial counsel rendered ineffective assistance when he failed to object to certain portions of the expert's testimony.  We affirm the judgment.

**BACKGROUND**

1. *The Information and Motions in Limine*

On February 23, 2015, defendant was charged by information with a count of corporal injury to a spouse (§ 273.5, subd. (a)).

---

[1] Unspecified statutory references are to the Penal Code.

On April 16, 2015, the People moved in limine to admit expert witness testimony from Deborah Jacroux on intimate partner battering under Evidence Code section 1107. The motion asserted that the jury may need Jacroux's expertise in order to understand the dynamics of the relationship between defendant and the victim (Sheila). Previously, Sheila had recanted, minimized, and refused to cooperate with the prosecution in prior domestic violence cases involving defendant. The People argued that Jacroux's testimony would assist the jury in understanding Sheila's behavior in this case.

Defendant opposed the People's request to admit Jacroux's testimony, because defendant did not intend to attack Sheila's credibility based on her failure to timely report past incidents of domestic violence or her previous decisions to continue a relationship with defendant.

On April 20, 2015, the trial court heard argument from the People on its motion in limine to admit Jacroux's testimony. The People opined that even though defendant was not going to make arguments pertaining to Sheila's delay in reporting the current act of violence, Jacroux's testimony was still relevant to "combat either the conscious or unconscious prejudices that some jury members may have, who are not as familiar with the dynamics of domestic violence relationships." Additionally, the previous acts of domestic violence were either unreported or reported by third parties. The trial court agreed with the People and ruled that Jacroux's testimony was admissible "for purposes of eliminating the common misconception that people may have [with respect to domestic violence cases]."

2. *The Trial*

a. **Prior Acts of Domestic Violence**

Defendant and Sheila had been married since 2012. Sheila said that at first, their relationship was good. Later, they started to have arguments. The arguments would get physical. She said that the arguments were "both [of their] faults," because they would

2

"both fuss." Sheila never physically hit defendant when they argued, but defendant would hit her. Sheila said she was "pushing [defendant's] buttons."

Sheila and defendant used to reside at a KOA Campground. While living there, the sheriff's office was called twice by neighbors due to fights between Sheila and defendant. Sheila did not call the police. At some point, Sheila and defendant moved to Castroville.

While living in Castroville, Sheila said that defendant hit her maybe two or three times. Neighbors called the police maybe 15 or 20 times. Sheila called the police once, telling the officers that defendant had grabbed her by the throat and had thrown her down onto the couch. She also told officers that defendant had kicked her, leaving bruises on her legs. The responding officer did not see bruising around Sheila's neck but there was bruising on one of her legs consistent with what she had described. Defendant denied hitting Sheila and explained that Sheila had bruised her leg when she suffered from a seizure just a few days before. Sheila told the officer that she did not want to file charges against defendant, and if charges were filed she would not appear in court.

Sheila said that defendant punched her in the eye during another fight. Sheila said she did not want to go to the hospital, because she did not want to get defendant in trouble. Officers investigated the incident, but Sheila told them that she had sustained the injury from falling, and defendant did not hurt her. Defendant told officers that he did not know how Sheila got injured. He told officers that she may have hurt herself after falling down during a seizure.

In September 2013, Sheila called the police after defendant allegedly grabbed her by the ankle, pulled her off a recliner, and caused her to hit her head on the floor. Sheila said she had a bump on her head, but officers were unable to see it since it was in her hairline. Officers, however, noticed that she had a red, puffy spot on her lip. Officers arrested defendant after that incident.

3

Julia, defendant's mother, testified that Sheila came to her house seeking refuge from defendant on at least three or four occasions. Sheila had not wanted to make any reports to the police, because she did not want defendant to get in trouble.

b.    **The Present Offense**

The incident giving rise to the present offense occurred on January 27, 2015. At the time, defendant and Sheila were living out of their car, which was parked on defendant's grandmother's property. Julia lived on the property and often heard the couple arguing.

Defendant had been drinking earlier in the day. That night, he went to his car and woke Sheila up by banging on the car window. Sheila and defendant began to argue. Sheila said that defendant wanted her to get more alcohol for him, but she refused. She locked defendant out of the car, because she knew he was going to get physical with her. After a few hours, Sheila let defendant into the car, thinking he would go to sleep. Defendant, however, began arguing with Sheila again.

This time, the argument became physical. Defendant grabbed Sheila's face, got on top of her, and held her down. Sheila pressed on the car's horn and was able to get out of the car. She returned to the car to get the keys out of the driver's side door. As she leaned in, defendant grabbed her hair and slammed her head on the inside of the car door.

Julia heard a loud bang from the house. Julia went outside and turned on the light. Julia saw that Sheila was running toward the house, crying. Julia saw that Sheila was injured and told Sheila that she was going to call 911. Julia reported that Sheila had a bump on her head that was "the size of a goose egg." In the background of the 911 call, Sheila can be heard saying that defendant kicked her and slammed her against the car. Defendant can be heard yelling at Sheila.

Officers Chad Giraldez and Matthew Costa responded to Julia's call. The officers noticed that defendant smelled strongly of alcohol. Giraldez said that defendant initially admitted that he had been arguing with Sheila. Defendant told Giraldez that Sheila had

4

woken him up after he fell asleep in the car and had started yelling at him. Defendant insisted that after Sheila yelled at him, he walked away from the car. Defendant denied that he hurt Sheila. He also told Giraldez that Sheila was an alcoholic.

Officer Costa spoke to Sheila, who told him what had transpired. Costa noticed that Sheila had a "big knot" on her head. Sheila declined medical attention. Costa said that Sheila was steady on her feet and did not appear intoxicated. Afterwards, the officers arrested defendant.

According to defendant, he had gone to sleep that night in the car after he took his medication. Defendant said he may have had a shot of whiskey. Defendant said he woke up and heard the car alarm going off. He told Sheila to turn the alarm off. Defendant heard Julia yell, asking them what was going on. Defendant said that Sheila then jumped out of the car and went up to the house. Defendant testified that Sheila had been drinking all night. Later, Sheila woke him up by yelling and screaming at him. Defendant said he got out of the car and walked away without any violence.

c. **Defendant's Testimony**

Defendant testified that he never punched Sheila. He admitted that he would sometimes grab Sheila's drinks from her and had slapped her in the face before. Defendant said that Sheila had previously slapped him, kicked him in the groin, and hit him with her fist. Defendant said that Sheila had a drinking problem and would get aggressive and violent after having too many drinks. Defendant admitted that he had, on a prior occasion, pleaded guilty to a domestic violence charge of battery. He explained that he had done so in order to spare Sheila any public humiliation that may arise from her alcoholism.

d. **Deborah Jacroux's Testimony**

The People called Deborah Jacroux to testify as an expert on intimate partner battering. Jacroux had not met defendant or Sheila, and did not know the details of the case. First, Jacroux explained the cycle of violence that occurs in domestic violence

5

relationships. There is a honeymoon phase, which is followed by verbally abusive comments that can escalate to physical altercations. After violence occurs, the honeymoon phase continues again. Over time, the honeymoon phase either becomes shorter or disappears completely.

Jacroux explained that there are many reasons why someone would stay in an abusive relationship. The victim may love the abuser, or the abuser may be the only person in the victim's life. There may be financial pressures to stay in the relationship and there may be children involved.

Jacroux testified that in her experience, victims of domestic violence do not always report every incident of abuse to the authorities. In fact, failing to report incidents is very common. Frequently, victims will report abuse but will not want their abuser to be prosecuted.

Abuse victims also suffer from trauma, which Jacroux likened to those who have come back from war. Victims will often feel numb. Jacroux explained that this will affect the way victims describe their abuse. They will respond slowly and will be unable to recall memories. It also makes it hard for the victim to accurately recall specific facts. Sometimes, victims will begin to recall, little by little, more facts about certain incidents. As a result, a victim's testimony may sometimes seem unbelievable.

Jacroux was asked whether a victim who cannot recall something must have suffered trauma. Jacroux answered that there could be many reasons for the victim's inability to recall, such as brain injury or simply bad memory. Jacroux also said that the victim could be lying, but "it's not been my experience."

3. *Verdict and Sentencing*

On April 24, 2015, the jury found defendant guilty of one count of corporal injury to a spouse (§ 273.5, subd. (a)). On June 4, 2015, the trial court sentenced defendant to a middle term of three years in prison. He was given credit for 128 days of actual custody credit and 128 days of conduct credit, for a total of 256 days. Defendant was ordered to

6

pay a restitution fine of $900 (§ 1202.4, subd. (b)(2)), a court operations assessment (§ 1465.8, subd. (a)(1)) of $40, and a court facilities assessment (Gov. Code, § 70373) of $30. A parole revocation restitution fine of $900 was imposed but suspended. (§ 1202.45.)

Defendant timely appealed.

**DISCUSSION**

On appeal, defendant focuses his arguments on Jacroux's expert witness testimony. He claims the court abused its discretion in admitting the testimony, because it was more prejudicial than probative and improperly bolstered the victim's credibility. In the event that any of these claims are forfeited due to his trial counsel's failure to object below, defendant argues that his trial counsel rendered ineffective assistance. We first discuss whether defendant forfeited arguments pertaining to the admissibility of Jacroux's testimony.

1. *Forfeiture*

Pretrial, defendant opposed the People's motion in limine seeking to introduce Jacroux's testimony on the basis that her testimony was irrelevant. Defendant argued that he did not intend to attack Sheila's credibility based on her failure to report previous acts of domestic violence and her decision to continue a relationship with defendant. The trial court considered defendant's arguments, but granted the People's motion and allowed Jacroux to testify. When Jacroux testified, defendant's trial counsel did not object to any of her statements.

On appeal, defendant now argues that Jacroux's testimony was more prejudicial than probative and impermissibly conveyed to the jury that Sheila's testimony should be

7

found credible.[2] Defendant did not object to Jacroux's testimony on these additional bases below, so he has forfeited these arguments on appeal. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 81-82 (*Coffman*) [failure to object on ground raised in appeal forfeited argument]; *People v. Williams* (2000) 78 Cal.App.4th 1118, 1126; Evid. Code, § 353.)

Regarding the alleged irrelevancy of Jacroux's testimony, defendant now argues that the Jacroux offered irrelevant testimony on a variety of subjects including why victims stay with abusers. On its face, this appellate argument is similar to his in limine objection to the evidence below. Defendant, however, did not renew his objection to the relevancy of Jacroux's testimony.

"Generally, when an *in limine* ruling that evidence is admissible has been made, the party seeking exclusion must object at such time as the evidence is actually offered to preserve the issue for appeal. [Citations.] The reason for this rule is that until the evidence is actually offered, and the court is aware of its relevance in context, its probative value, and its potential for prejudice, matters related to the state of the evidence at the time an objection is made, the court cannot intelligently rule on admissibility." (*People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3.)

There are certain exceptions. "[I]f a motion to exclude evidence is made raising a specific objection, directed to a particular, identifiable body of evidence, at the beginning of or during trial at a time when the trial judge can determine the evidentiary question in its appropriate context, the issue is preserved for appeal without the need for a further objection at the time the evidence is sought to be introduced." (*People v. Crittenden* (1994) 9 Cal.4th 83, 127.)

---

[2] Additionally, defense counsel is the one who elicited testimony from Jacroux regarding whether domestic violence victims lie. Since this error was invited, it is also forfeited for that reason. (*People v. Williams* (2009) 170 Cal.App.4th 587, 620.)

8

Here, however, defendant's objection to the specific evidence—Jacroux's testimony—was not made at a time when the trial court could fairly ascertain the admissibility of the testimony in context. Sheila had not yet testified about her relationship with defendant. At the time the in limine motion was made, the trial court could not determine, as defendant now argues on appeal, that Jacroux's testimony exceeded the scope of what was relevant to the case. Accordingly, we find that defendant has forfeited his arguments pertaining to the admissibility of Jacroux's testimony.

Defendant acknowledges that he did not raise a specific objection to Jacroux's testimony at trial. He argues that this court has the discretion to consider the forfeited arguments on appeal by citing to *People v. Williams* (1998) 17 Cal.4th 148, 161, footnote 6. *Williams*, however, noted that although an appellate court is generally not prohibited from addressing forfeited arguments, "it is in fact barred [from addressing forfeited arguments] when the issue involves the admission (Evid. Code, § 353) or exclusion (*id.*, § 354) of evidence." (*Ibid.*) Here, defendant is challenging the admissibility of evidence. His failure to object below has forfeited his arguments on appeal.[3]

2. *Ineffective Assistance of Counsel*

Defendant argues that his trial counsel was ineffective, because she failed to object to Jacroux's testimony when it exceeded the scope of the trial court's pretrial in limine ruling and failed to object to her testimony that touched on Sheila's credibility.

a. **Overview**

To succeed on a claim of ineffective assistance of counsel, defendant must show both that counsel failed to act in a manner to be expected of a reasonably competent

---

[3] However, since defendant raises an argument of ineffective assistance of counsel, we address the merits of defendant's claims of inadmissibility in the context of ineffective assistance of counsel below.

attorney acting as a diligent advocate and that defendant was prejudiced thereby.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-217; *Strickland v. Washington* (1984) 466 U.S. 668, 684 [discussing federal constitutional rights]; *People v. Pope* (1979) 23 Cal.3d 412, 422 [discussing both state and federal constitutional rights].)

" 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' [Citations.]  '[W]e accord great deference to counsel's tactical decisions' [citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [citation].  'Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926.)

"In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver*, *supra*, 26 Cal.4th at p. 926.)

We " 'need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed.' " (*In re Jackson* (1992) 3 Cal.4th 578, 604, quoting *Strickland v. Washington*, *supra*, 466 U.S. at p. 697.)  A defendant establishes prejudice by demonstrating that without the deficient performance there is a reasonable probability the result would have been more favorable.  In other words, even if counsel's actions fall below the threshold of reasonableness, a defendant must still show that counsel's actions were prejudicial. (*People v. Ledesma*, *supra*, 43 Cal.3d at p. 218.)  A defendant must prove prejudice that is a " 'demonstrable reality,' not

10

simply speculation." (*People v. Williams* (1988) 44 Cal.3d 883, 937; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

b. **Admissibility of Jacroux's Testimony**

First, we find that defendant cannot establish ineffective assistance of counsel, because he is unable to show that his trial counsel did not have a tactical reason for her failure to object to Jacroux's testimony.

Evidence Code section 801, subdivision (a) permits expert witnesses to testify on subjects "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." Evidence Code section 1107, subdivision (a) provides that "[i]n a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." Evidence Code section 352 provides that a court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

There are two steps to consider in order to determine whether expert testimony on intimate partner battering (or battered woman syndrome (BWS)) is relevant. First, there must be sufficient evidence to support a contention that BWS applies to the victim. (*People v. Gadlin* (2000) 78 Cal.App.4th 587, 592.) Second, there must be a contested issue to which BWS is probative. (Evid. Code, § 801; *People v. Gadlin*, *supra*, at p. 592.) Although expert witness testimony on domestic violence "cannot be admitted to prove the occurrence of the charged crimes" (*People v. Brown* (2004) 33 Cal.4th 892, 908), it can be admitted to explain the behavior of victims of abuse.

11

Here defendant argues that Jacroux's testimony was more prejudicial than it was probative under Evidence Code section 352. Defendant maintains that the *scope* of Jacroux's testimony was unfairly prejudicial because it included facts and issues that were not relevant to the case. For example, defendant opines that Jacroux testified that victims of domestic violence may sometimes stay in an abusive relationship because of children, lack of alternative options, and fear of deportation. Yet none of these circumstances were present in defendant's case.

This claim is without merit. "When BWS testimony is properly admitted, testimony about the hypothetical abuser and hypothetical victim is needed for BWS to be understood. To the extent that the expert testimony suggests hypothetical abuse that is worse than the case at trial, it may even work to the defendant's advantage. In any event, limiting the testimony to the victim's state of mind without some explanation of the types of behaviors that trigger BWS could easily defeat the purpose for which the expert is called, which is to explain the victim's actions in light of the abusive conduct." (*People v. Gadlin*, *supra*, 78 Cal.App.4th at p. 595.)

The jury was instructed not to consider Jacroux's testimony as evidence that defendant committed any of the crimes against him. The hypothetical scenarios discussed were used to help the jury understand BWS. Jacroux in no way inferred that Sheila herself suffered through similar situations. Jacroux expressly testified that she was not familiar with the facts of the case, had not met defendant, and had not met Sheila. The jury was also instructed that it could only consider Jacroux's testimony in deciding whether Sheila's conduct was not inconsistent with the conduct of someone who has been abused, and in evaluating the believability of her testimony. Based on the foregoing, we cannot find that a reasonable jury would have considered Jacroux's testimony as, for example, inferring that Sheila stayed in her relationship because she feared deportation, or that she had nowhere else to go.

12

Furthermore, Jacroux's testimony was probative as to the contested issue of Sheila's credibility. Defendant maintains that the Jacroux's testimony was not relevant, because after the present act of violence—when defendant slammed Sheila's head against the car door—Sheila instituted divorce proceedings, did not remain in the abusive relationship, did not delay in reporting the incident, and was cooperative throughout the process. However, defendant acknowledges that the People introduced prior acts of domestic violence, during which Sheila often blamed herself for her injuries or failed to report defendant as the one responsible. Sheila also reconciled with defendant multiple times and stayed with him even after the prior acts of violence. Therefore, Jacroux's testimony *was* relevant and assisted the jury to understand why Sheila may have declined to cooperate with the police in the past, why she did not report defendant for his acts of violence on earlier occasions, and why she continued to stay with defendant even after he allegedly hit her.

Based on the content of Jacroux's testimony, we do not believe Jacroux's testimony was more prejudicial than probative under Evidence Code section 352. Therefore, defendant fails to establish that an objection would have been sustained based on the arguments made on appeal. Accordingly, we must reject his claim that his trial counsel rendered ineffective assistance. (*People v. Thomas* (1992) 2 Cal.4th 489, 531 [failure to make meritless objection is not ineffective assistance].) Defense counsel may have reasonably believed that an objection on these grounds was futile.

Second, defendant argues that his counsel was deficient for failing to object to Jacroux's testimony that he claims impermissibly vouched for the veracity of domestic violence victims. During her cross-examination, Jacroux was asked by defense counsel whether a victim who cannot recall past incidents must have suffered trauma. Jacroux answered that there could be many reasons for the victim's inability to recall, such as a brain injury or a bad memory. Jacroux also said that the victim could be lying, but "it's not been my experience." Defendant argues that Jacroux's statements impermissibly

13

invaded the province of the jury by insinuating that it was unlikely that Sheila was lying about the crime.

Defendant relies on the proposition that expert witnesses may not express opinions on witness credibility. "A witness may not express an opinion on a defendant's guilt. [Citations.] The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue. [Citations.] 'Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' " (*Coffman*, *supra*, 34 Cal.4th a p. 77.) Additionally, "[t]he general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond the common experience that the expert's opinion would assist the trier of fact; in other words, the jury essentially is as well equipped as the expert to discern whether a witness is being truthful." (*Id*. at p. 82.)

Jacroux's testimony, however, did not express an opinion on the veracity of Sheila's testimony. Jacroux testified that she had never met Sheila or defendant and had no knowledge of the case. Her testimony only covered generalized subjects concerning BWS. When asked if victims could be lying due to their inability to recall, Jacroux said that the victims "could" be lying, though in her experience they were not. In other words, Jacroux did not express an opinion that *all* domestic violence victims tell the truth. She also did not express an opinion that in this particular case, Sheila was telling the truth.

Defendant argues that although Jacroux did not testify as to specific facts about Sheila's circumstances or the present case, her comments were still inadmissible. One appellate court has held that "[e]vidence of a generalized tendency of some groups of witnesses to lie, unrelated to the credibility of the specific witnesses in issue, is irrelevant and not the subject of legitimate scientific evidence from expert witnesses." (*People v. Johnson* (1993) 19 Cal.App.4th 778, 786.)

We are not convinced that Jacroux's testimony impermissibly implied that there was a generalized tendency for victims of domestic violence to tell the truth. As noted, Jacroux did respond that victims could be lying. However, assuming without deciding that Jacroux's statement was erroneous and should have been stricken, we find that defendant fails to show prejudice.

c. **Prejudice**

To establish ineffective assistance of counsel, a defendant shows prejudice by demonstrating that without his counsel's deficient performance there is a reasonable probability that defendant would have received a more favorable result. In other words, even if counsel's actions fall below the threshold of reasonableness, a defendant must still show that counsel's actions were prejudicial. (*People v. Ledesma*, *supra*, 43 Cal.3d at p. 218.)

Assuming that the complained-of portions of Jacroux's testimony—both the allegedly irrelevant comments about hypothetical BWS scenarios and the purportedly inadmissible vouching testimony—had been excluded, there was overwhelming evidence of defendant's guilt. Defendant had a history of committing domestic violence against Sheila. The police had been called on numerous occasions after defendant and Sheila had altercations and had responded and investigated several times. Defendant's own mother, Julia, recalled that Sheila had sought refuge with her from defendant on several occasions. Julia testified that during the night in question, she had heard defendant yelling at Sheila. She also heard a loud bang, and saw Sheila run towards the house holding her head. She saw the injury to Sheila's head and called 911 on Sheila's behalf. Additionally, Julia testified that she believed that Sheila's previous injuries were likely caused by her son.

Defendant's testimony was also contradicted by the responding officers' testimony. Defendant said that he had not been drinking that night, and Sheila had been

15

drinking all night. Officers, however, said that when they arrived at the scene defendant smelled strongly of alcohol and Sheila did not.

The jury was also instructed with CALCRIM No. 850, which instructed them that "Jacroux's testimony about intimate partner battering is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [Sheila's] conduct was not inconsistent with the conduct of someone who has been abused, and in evaluating the believability of her testimony." We must presume that the jury followed these instructions and did not consider Jacroux's testimony when making their determination as to whether the abuse actually occurred. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1321.)

Defendant notes that CALCRIM No. 850 specifically instructs the jury to consider Jacroux's testimony when evaluating Sheila's "believability." Therefore, he argues that her comment that domestic violence victims could lie, but in her experience they do not, was especially prejudicial. We do not believe that this one statement was so prejudicial that it is reasonably probable that without its admission, defendant would have received a more favorable result. As we already described, there was strong evidence of defendant's guilt.

Based on the foregoing, we find that defendant fails to establish ineffective assistance of counsel.

## DISPOSITION

The judgment is affirmed.

16

_____
                                          Premo, J.


WE CONCUR:


_____
           Rushing, P.J.


_____
           Grover, J.


People v. Ruch
H042445